UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEBORAH A. KENNING, as personal
representative of the Estate of Robert Allan
Cortes,

    Plaintiff,

v.                                                                      Case No: 8:13-cv-2187-T-36TGW

DANIEL CARLI, JORDAN HERNANDEZ
and CITY OF LAKELAND,

    Defendants.
_____/

## **ORDER**

This matter comes before the Court upon the Defendants' Motion for Summary Judgment (Doc. 35), Plaintiff's response thereto (Doc. 46), and Defendants' reply (Doc. 49). This case arises from the shooting and death of Robert Allan Cortes ("Cortes"), which occurred on March 15, 2012. Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 35) will be granted.

**I.    STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

On March 15, 2012, Officers Carli and Hernandez of the Lakeland Police Department ("LPD") were informed that a woman requested police assistance to remove her belongings from a trailer and that the resident of that trailer is normally armed with a handgun. Doc. 39-1 at 11:23 – 12:1; Doc. 40-1 at 25:19-24. Carli and Hernandez met the woman, Lisette Galarza ("Galarza"), and her friend, Kimberly Olson ("Olson"), in the parking lot of a strip mall, just outside the trailer

---

[1] The Court presents the facts in the light most favorable to the non-moving party based on the parties' submissions, affidavits, and deposition testimony, as required by Fed. R. Civ. P. 56.

park. Doc. 39-1 at 14:5-15. Galarza told the Officers that she wanted to go to the trailer to retrieve some of her personal belongings and that there had been previous domestic violence incidents. Doc. 39-1 at 15:1-3; Doc. 40-1 at 37:15-20. "She was afraid something was going to happen if she went by herself, and she wanted us to make sure that she would be okay." Doc. 39-1 at 15:3-5.

The Officers followed Galarza to Cortes' residence, a trailer in the Lakeland Palms Mobile Home Park. Doc. 39-1 at 16:3-6; Doc. 41-1 at 21:7-10. Olson pulled into the driveway, with Galarza in her passenger's seat, and parked close to the front door. Doc. 40-1 at 37:7-14; Doc. 40-2 at pp. 2-3. The Officers parked their vehicles next to and behind Olson's vehicle. *See* Doc. 40-1 at 35:12-24; Doc. 40-2 at pp. 1-2. The Officers did not activate their lights or sirens. Doc. 39-1 at 13:22-24; Doc. 40-1 at 84:1-3.

The door of Cortes' trailer was approximately three stairs off the ground and behind a large tree. Doc. 37-1 at 10:11-21, Doc. 40-2 at p. 1. The Officers exited their vehicles and stood near the door. Doc. 39-1 at 16:7-11. Carli was next to the large tree, about fifteen feet from the door, and Hernandez was to his right, in the driveway and approximately five to ten feet from the front door. Doc. 39-1 at 16:12 – 17:2; Doc. 40-1 at 41:2 – 42:9; Doc. 40-2 at p. 6.

Galarza knocked on the door, said "it's me with the police", and stepped down the stairs. Doc. 40-1 at 44:3-11; Doc. 39-1 at 18:23 – 19:2. Cortes opened the door within a few seconds. Doc. 40-1 at 44:3-11; Doc. 39-1 at 17:18 – 18:1. Cortes opened the door all the way, so it was flat against the side of the trailer. Doc. 39-1 at 18:2-9. When Cortes opened the door he was standing inside the trailer at the threshold of the door and Carli saw a gun in his right hand. Doc. 39-1 at 18:13-22. Carli yelled "Gun. Gun. Gun." and drew his weapon. Doc. 39-1 at 19:18-22. Upon hearing this, Hernandez drew his weapon with his right hand and, with his left hand, used his shoulder mic to call "emergency traffic" out on his police radio. Doc. 39-1 at 20:11-14; Doc. 40-

2

1 at 45:16 – 46:5. Hernandez and Carli yelled at Cortes to "drop the gun" or "put the gun down" and Cortes dropped it just inside the trailer door on the floor. Doc. 39-1 at 19:23 – 20:9; Doc. 40-1 at 47:6-19, 48:4-6. Cortes then put his hands up and came down the front steps of his trailer. Doc. 39-1 at 20:22 – 21:2; Doc. 40-1 at 50:4-15. Cortes stopped on the bottom step and put his hands down. Doc. 40-1 at 51:2-6, 52:13-16. Hernandez and Carli testified that Cortes then turned around, took a step up and started reaching for the gun with his left hand. Doc. 39-1 at 21:12-22; Doc. 40-1 at 52:21-23. Both Officers told Cortes to "Stop. Stop. Stop." Doc. 39-1 at 22:1-4; Doc. 40-1 at 53:2-5. Cortes did not touch the gun before Hernandez started shooting. Doc. 39-1 at 21:24-25; Doc. 40-1 at 53:15-17. Hernandez fired three times and Carli fired six times. Doc. 39-1 at 22:17-25; Doc. 40-1 at 54:7-19. Hernandez hit Cortes only once, in his right arm. Doc. 40-1 at 54:23-25. Cortes never pointed his gun at the Officers, Galarza, or Olson. Doc. 39-1 at 19:7-17.

Cortes fell and landed face down, just in front of the steps. Doc. 40-1 at 54:20-22, 74:12-22. Neither Carli nor Hernandez made physical contact with Cortes or his weapon until other officers arrived on the scene. Doc. 39-1 at 24:22 – 25:5; Doc. 40-1 at 56:11 – 57:3. Carli called for EMS and holstered his gun. Doc. 39-1 at 23:8-13. Cortes died at the scene. Doc. 38-1 at 38:10-15; Doc. 39-1 at 24:20-21.

Galarza collapsed on the ground, screaming and crying. Doc. 39-1 at 23:20-22. Carli grabbed Galarza, told her he needed to move her behind the patrol car for safety, and then did so. Doc. 39-1 at 23:23-25. Galarza told Carli that if Cortes died she would sue him. Doc. 39-1 at 24:2-4. Carli then went back to where he was previously standing and redrew his weapon. Doc. 39-1 at 24:11-14. Carli and Hernandez then took turns reloading their guns. Doc. 39-1 at 24:15-19. The Officers were concerned that someone else may be in the trailer with access to Cortes' gun. Doc. 39-1 at 24:17-19. Cortes was not moving at this point. Doc. 39-1 at 24:20-21.

3

Defendants have filed the deposition of Associate Medical Examiner Vera Volnikh, M.D. ("Dr. Volnikh"). *See* Doc. 41. The exhibits to this deposition include an Autopsy Report that describes seven entrance wounds and one re-entrance wound on Cortes' body. Doc. 41-3 at pp. 31-33. The description of these wounds includes the direction of the wound paths "with respect to the standard anatomic position", which is standing straight up with arms at your side and palms facing forward. Doc. 41-1 at 8: 18-25, 9:13-21; Doc. 41-3 at pp. 31-33, 38. However, Dr. Volnikh testified that she cannot determine what position Cortes was in when he was shot, nor can she determine where the shots came from (i.e. where the officers were standing in relation to Cortes). Doc. 41-1 at 9:24 – 10:7. Dr. Volnikh also cannot determine the chronological order of the wounds (i.e. which shot hit Cortes first, second, etc.). Doc. 41-1 at 21:4-7. Dr. Volnikh concluded that Cortes was intoxicated with methamphetamines and methadone at the time of his death. Doc. 41-1 at 26:15-17.

Olson testified that Cortes was shot in the front of his body. Doc. 38-1 at p. 26. However, Dr. Volnikh's testimony, the autopsy report, and the autopsy photographs demonstrate that none of the entrance wounds on Cortes' body were in the front of his body. Doc. 41-1 at 56:15-23. Cortes' neighbor, Karenetta Wood testified that Cortes had his hands in the air when he exited the trailer, but she did not know what movements Cortes may have made just before he was shot and does not know where he was shot. Doc. 37-1 at 16:5-18, 46:6-24, 47:13-15, 56:23-25, 60:5-11, 62:2-11.

## II. STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits. *See*

Fed. R. Civ. P. 56(a). Issues of fact are genuine only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*

In deciding a motion for summary judgment based on qualified immunity, the Court must resolve all issues of material fact in favor of the plaintiff. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). The facts are viewed in the light most favorable to the plaintiff because the legal issue of qualified immunity on summary judgment is "not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." *Id.* (*quoting Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998)). Although the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case[,]" for summary judgment purposes, all reasonable inferences from the facts are to be drawn in favor of the plaintiff. *Lee*, 284 F.3d at 1190 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009). *See also Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 459 (11th Cir. 1994). ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.").

**III.   DISCUSSION**

Plaintiff's Complaint alleges three counts against three defendants: Count I for battery against the City of Lakeland, Florida ("the City"); Count II for excessive force in violation of 42 U.S.C. § 1983 ("§ 1983") against Officer Carli; and Count III for excessive force in violation of §

1983 against Officer Hernandez. *See* Doc. 1. Defendants have moved for summary judgment on all three counts.

### A. Plaintiff's Excessive Force Claims

Defendants Carli and Hernandez argue that they are entitled to qualified immunity with regard to the claims against them. With regard to § 1983 claims, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary authority if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Koch v. Rugg*, 221 F.3d 1283, 1294 (11th Cir. 2000); *Collins v. Sch. Bd. of Dade County*, 981 F.2d 1203, 1205 (11th Cir. 1993) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The determination of whether a defendant is entitled to qualified immunity is generally a question of law for the court. *See Bates v. Harvey,* 518 F.3d 1233, 1239 (11th Cir. 2008)

The standard for qualified immunity is well established. First, the government official must show that he was engaged in a "discretionary function" when he committed the allegedly unlawful acts. *See Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1285 (11th Cir. 2009). If the officials were not acting within the scope of their discretionary authority, then they are ineligible for the benefit of qualified immunity. *Id.* If, however, the defendants meet the initial burden of establishing that they were acting within the scope of their discretionary authority, then the burden shifts to Plaintiff to show that qualified immunity is inappropriate. *Id.* Here, Plaintiff does not dispute that Carli and Hernandez were acting within the scope of their discretionary

6

authority. Doc. 46 at p. 7. Accordingly, the burden shifts to Plaintiff to show that qualified immunity is inappropriate.

To do so, the plaintiff must satisfy the two-pronged test articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), by presenting factual evidence showing (1) the Officers violated a constitutional right, and (2) this right was clearly established at the time of the violation. "Clearly established" means that it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Id.* Therefore, the question for this Court in assessing the Officers' immunity from damages under § 1983 is whether Plaintiff has presented evidence of the violation of a clearly established constitutional right. *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003).

The use of excessive force by a law enforcement officer constitutes a violation of the Fourth Amendment. *See Davis v. Williams*, 451 F.3d 759, 767 (11th Cir.2006). Whether the amount of force used was reasonable or excessive is determined objectively "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight" and requires "careful attention to the facts and circumstances of each particular case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)). The factors to be analyzed include: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Priester*, 208 F.3d at 924; *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). The totality of the circumstances are considered "to determine whether the manner of arrest was reasonable." *Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir.2004). "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and

(3) the extent of the injury inflicted." *Id*. at 1277–78 (quoting *Lee*, 284 F.3d at 1198). The force exerted by the officer must be "reasonably proportionate to the need for that force" which is measured by the three factors set forth in *Priester*. *Lee*, 284 F.3d at 1198.

An officer may use deadly force to protect himself or others from a threat of serious physical harm. *See Troupe v. Sarasota County*, *FL*, 419 F.3d 1160, 1168-69 (11th Cir. 2005) (concluding officer acted objectively reasonable and was entitled to qualified immunity where he fatally shot the decedent who was driving a vehicle directly in the officer's path; "[e]ven if in hindsight the facts show the SWAT team could have escaped unharmed, a reasonable officer could have perceived that [the decedent] posed a threat of serious physical harm.").

Here, Plaintiff argues that qualified immunity should be denied because Cortes had his hands up and was complying with the Officers' commands at the time he was shot. However, the physical evidence supports the Officers' statements that Cortes had turned around before being shot. Cortes had been instructed to get on the ground and his decision to turn around instead alerted the Officers that he may be going to grab the gun he had just dropped by his doorway. If Cortes had reached his weapon he could have shot the officers, Galarza, Olson, or any other bystander. "'[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Quiles v. City of Tampa Police Dept.*, 2015 WL 53707 *3 (11th Cir. 2015) (quoting *Long v. Slaton,* 508 F.3d 576, 581 (11th Cir. 2007) and *Montoute v. Carr,* 114 F.3d 181, 185 (11th Cir. 1997)). While the Officers were not there to arrest Cortes, they were aware that Galarza was fearful of him and that is why she asked for police assistance in retrieving her personal property from his home. It was reasonable for the Officers to believe that, if Cortes had reached his weapon, he would have presented a serious and potentially deadly danger to the Officers and others.

Plaintiff argues that there is a factual dispute as to whether Cortes turned around and reached for his gun before being shot, based on the testimony of Karenetta Wood and Kimberly Olson. However, neither of these witnesses' testimony creates a legitimate issue of fact. Olson's testimony that Cortes was shot "in the front" is blatantly contradicted by the physical evidence which shows that all of his entrance wounds were in his back or side. Wood testified that she assumed Cortes was shot in the front because she only saw him facing forward with his hands in the air. Again, the physical evidence contradicts this. Furthermore, Wood admitted that she did not know what actions Cortes may have taken immediately before the shooting began.

While the Court must look at the facts in the light most favorable to the Plaintiff, it cannot deny summary judgment based on testimony that is clearly contradicted by physical evidence. *See Morton v. Kirkwood,* 707 F.3d 1276, 1284 (11th Cir. 2013) ("'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Here, all of the witnesses agree about where the police were standing when they shot at Cortes – Carli was in front of and facing toward the trailer and Hernandez was slightly to Cortes' left but also facing toward the trailer door. Thus, the only way for Cortes to have been shot in the back and the right arm is if he turned his back on the Officers prior to being shot – so that his back was to Carli and his right arm was toward Hernandez. The autopsy report and photographs make it clear that all of the bullet entrance wounds were in Cortes' back and right arm.

The record evidence establishes that the Officers acted reasonably and did not use excessive force in violation of 42 U.S.C. § 1983. Because the Officers did not violate Cortes' constitutional rights, there is no need to determine whether any such right was clearly established.

9

Officers Carli and Hernandez are entitled to qualified immunity and summary judgment in their favor on Counts II and III of the Complaint.

### B. Battery Claim Against the City

Plaintiff further claims the City is vicariously liable under Florida law for battery based upon its employees allegedly improper actions. "Battery is 'the intentional infliction of a harmful or offensive contact upon the person of another.'" *Cutino v. Untch*, No. 12-22201-CIV, 2015 WL 178481, *8 (S.D. Fla. Jan. 14, 2015) (quoting *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So.2d 52, 54 (Fla. 4th DCA 1984)). "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). "Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis,* 451 F.3d at 768 (quoting *Sanders*, 672 So.2d at 47). "'A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances.'" *Cutino*, 2015 WL 178481 at *8 (citing *Sanders*, 672 So.2d at 47). As discussed above, the Officers' use of force in this case was reasonable under the circumstances and not "clearly excessive." Accordingly, the Officers did not commit battery and the City is entitled to summary judgment on Count I.

As no genuine issues of material fact exist, Defendants are entitled to judgment in their favor as a matter of law. It is hereby

**ORDERED AND ADJUDGED that**:

1. Defendants' Motion for Summary Judgment (Doc. 35) is GRANTED.

2. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff on all counts.

       3.      The Clerk is further directed to terminate all pending motions and deadlines and close this case.

      **DONE AND ORDERED** in Tampa, Florida on June 5, 2015.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any